IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:07CR292 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| JAMES D. PUGH, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress filed by defendant James D. Pugh (Pugh) (Filing No. 9). Pugh is charged in the Indictment with the possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Pugh seeks to suppress evidence obtained by the Nebraska State Patrol (NSP) on June 2, 2007, following a search of luggage at the Amtrak Station in Omaha, Nebraska.

Evidentiary hearings were held on Pugh's motion on October 22, 2007 and October 24, 2007. Pugh was present for the hearings along with his retained counsel, J. William Gallup. The United States was represented by Assistant U.S. Attorney Robert C. Sigler. During the hearing, the court heard the testimony of NSP Investigators Alan Eberle (Investigator Eberle) and Jason Scott (Investigator Scott), and the defendant Pugh. The court also received into evidence: photographs of a suitcase (Exhibits 1 and 2); photographs of a hotel bill and airline tickets (Exhibits 3 and 4), a photograph of several Wal-Mart bags and a suitcase (Exhibit 5), and a handwritten statement of Amber Hammerschmidt (Exhibit 101). A transcript of the hearing (TR.) was filed on November 2, 2007 (Filing No. 22).

**FINDINGS OF FACT**

The Commercial Interdiction Unit (CIU) is composed of various investigators from the NSP and other investigatory agencies (TR. 4). The CIU looks for incidents dealing with explosives, drugs, weapons, or currency violations, *inter alia*. On occasion CIU investigators drive to Lincoln, Nebraska, and board the Amtrak train eastbound with a stop in Omaha, Nebraska (TR. 4). Usually in two-man teams, the officers will board the train

and, while the train is in route, talk to every passenger starting at the rear of train working their way forward (TR. 5). The officers will detrain at the Omaha terminal (TR. 5). The officers ask the passengers a few questions and seek to have each piece of luggage claimed by a passenger (TR. 5). If suspicions are aroused with regard to a particular passenger or piece of luggage, the officers seek the consent of the passenger to search the luggage or embark upon some other investigatory technique (TR. 5).

On August 2, 2007, CIU officers including NSP Investigators Eberle, Scott, and Haugaard, and DEA Special Agent Orduna boarded the Amtrak train in Lincoln, Nebraska, around 10 a.m. for the hour long ride to Omaha (TR. 6-7). Investigator Eberle started in the conductor car where the conductor permitted the officers to go through all the tickets for the passengers (TR. 8). After looking through the tickets, Investigator Eberle began walking through the coach cars and working their way forward talking to each of the passengers and noting any luggage (TR. 9). The other CIU officers started at the forward coach cars and worked their way backward (TR. 9). The CIU officers kept in contact with each other by Nextel phones (TR. 11).

Officer Eberele described the coach cars as having a outside doorway allowing the passenger to step into a lower vestibule with restrooms, a luggage area, and some seating for the handicapped or special needs (TR. 9). Most of the passengers use a set of winding steps to go to the upper level where there are rows of two sets of seats on each side of the coach car with overhead open bins for luggage (TR. 9; 57). The officers had a standard set of questions they asked each passenger, and if there was nothing suspicious, the officer moved on to the next passenger (TR. 10). The usual officer/passenger contact took about a minute and a half (TR. 10).

As the train was nearing Omaha, Amtrak made a announcement over the public address system that the train was pulling into Omaha and this would be an opportunity for passengers to take a smoke break and stretch their legs (TR. 13). After the announcement is made, various passengers moved to the lower area of the coach car to take advantage of the Omaha stop (TR. 13). As the train was nearing the Omaha station, Investigator Scott encountered Pugh as the next person Investigator Scott would visit with (TR. 56). Pugh was seated toward the last part of the coach car and stood to put his hands on a suitcase

in the overhead compartment (TR. 56-57). Investigator Scott identified himself as law enforcement, explained that Pugh was not under arrest, that Investigator Scott was speaking with all of the passengers, and asked if Pugh could give Investigator Scott some of Pugh's time (TR. 56). Pugh said yes and spoke with Investigator Scott (TR. 56). Investigator Scott asked Pugh if Pugh had his train ticket with him, and Pugh presented the ticket to Investigator Scott (TR. 58). After Investigator Scott examined the ticket, he asked Pugh where Pugh's trip originated, where Pugh was headed, the nature of Pugh's trip, and if Pugh had any bags on the train (TR. 58-59). Pugh pointed to two Wal-Mart sacks and a black attache case in the overhead luggage rack above (TR. 59; Exhibit 5). Another suitcase (Exhibit 1) was also in the overhead and Investigator Scott asked Pugh if that bag was Pugh's (TR. 59). Pugh said "No, it wasn't"(TR. 59). Investigator Scott looked at a female passenger nearby and she nodded her head up and down when Pugh was asked if the bag was his (TR. 60). Thereafter, Pugh walked away and towards the stairwell (TR. 61). Investigator Scott contacted Investigator Haugaard to keep an eye on Pugh (TR. 61). Investigator Scott then asked the female about the bag and she told Investigator Scott that the bag appeared to be Pugh's and that Pugh had possession of the bag several times during the night (TR. 62).

Investigator Eberle walked to the lower coach car lobby area of the coach car where Pugh and three or four other passengers were waiting to get off at the Omaha station platform (TR. 14). Investigator Scott brought the bag down to the lobby area and Investigator Eberle pulled out his badge and said "Everyone, I'm with law enforcement. We're trying to find the owner of this bag" (TR. 14). Investigator then asked everyone individually in the lobby area if the bag belonged to them (TR. 14). Each person, including Pugh, said the bag did not belong to them (TR. 14). Pugh stated, "No, that's not mine" (TR. 15). Investigator Scott then took the bag upstairs and walked down the aisle of the coach asking each of the remaining passengers upstairs if the bag belonged to them (TR. 63). No one claimed the bag (TR. 63).

As the train pulled into the Omaha station and stopped, the passengers, including Pugh, who were standing in the lower coach car lobby area got off the train and walked onto the platform (TR. 17). As Pugh got off the coach car, he dropped a piece of paper to

the platform (TR. 17). Another passenger picked it up and offered it to Pugh who declined it by saying "No, I don't need that" (TR. 17). Investigator Eberele picked up the paper (TR. 17). Investigator Eberele approached Pugh and again presented his credentials (TR. 18). Investigator Eberele explained to Pugh that Pugh was not under arrest but that Investigator Eberele wanted to ask Pugh some questions about Pugh's trip (TR. 17). Investigator Eberle engaged Pugh in conversation as a delaying tactic while Investigators Scott and Haugaard were on the coach car seeing if anyone claimed the luggage in question (TR. 18). Shortly thereafter, Investigators Scott and Haugaard returned to the train platform with the luggage (TR. 19). Investigator Scott asked Pugh if the bag was Pugh's, and Pugh responded that it was not his (TR. 20; 23). The bag was then opened on the platform as abandoned property by Investigator Scott (TR. 22). The bag had airline baggage handling tags and cocaine was found in the bag as well as a cell phone charger (TR. 22). Investigator Eberele, in an effort to find items identifying the owner of the bag, asked Pugh if Investigator Eberele could search Pugh's person (TR. 21). Pugh turned sideways, lifted his hands, and said "Yeah, go ahead" (TR. 21). Investigator Eberele searched Pugh and found a cell phone matching the charger in the luggage as well as some airline tickets which matched the luggage handling tags (TR. 21). Pugh was arrested (TR. 23).

  Pugh recalled Investigator Scott approached him on the coach car before Pugh detrained (TR. 43). Pugh recalled he pointed out bags in the overhead and claimed them as his (TR. 43). Pugh stated he did not deny the bag in issue was his either when pointed out in the overhead or when brought down to the coach car lobby before the train arrived at the Omaha platform (TR. 43-44). After observing the demeanor of all the witnesses and weighing the testimony with all the evidence, the court credits Investigator Eberele's and Scott's testimony that Pugh denied the ownership of the bag on both occasions.

## LEGAL ANALYSIS

  Encounters between the police and citizens fall into three general categories:

  (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g., *Florida v. Bostick***, 501 U.S. 429 (1991); ***Florida v. Royer***, 460 U.S. 491 (1983); ***United States v. Tarantola***, 332 F.3d 498, 499 (8th Cir.

4

2003); ***United States v. Jones***, 269 F.3d 919, 925-26 (8th Cir. 2001); ***United States v. Hathcock***, 103 F.3d 715, 718-19 (8th Cir. 1997); ***United States v. Robinson***, 984 F.2d 911, 913 (8th Cir. 1993);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g., *United States v. Sokolow***, 490 U.S. 1 (1989); ***Reid v. Georgia***, 448 U.S. 438 (1980); ***Terry v. Ohio***, 392 U.S. 1 (1968); ***United States v. Maltais***, 403 F.3d 550, 554 (8th Cir. 2005); ***United States v. Bustos-Torres,*** 396 F.3d 935, 942 (8th Cir. 2005); and

(3) physical arrests, which must be supported by probable cause.  ***U.S. Const. amend. IV.***

The issue is whether the initial contact between the CIU investigator and Pugh was a purely consensual encounter or an investigatory detention or seizure.  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." ***Terry***, 392 U.S. at 19 n.16.  A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required.  ***Bostick***, 501 U.S. at 434; **see also *United States v. Drayton***, 536 U.S. 194, 200-01 (2002).  If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required.  ***Id***. (**quoting *California v. Hodari D.***, 499 U.S. 621, 628 (1991)).  In this case, Pugh's testimony is clear that when he responded to Investigator Scott's questions in the upper portion of the coach car, Pugh walked away from Investigator Scott (TR. 43).  "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen."  ***United States v. Green***, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted). A request for information does not turn consensual questioning into an investigatory stop. ***United States v. Pena-Saiz***, 161 F.3d 1175, 1177 (8th Cir. 1998); ***United States v. Poitier***, 818 F.2d 679, 682-83 (8th Cir. 1987).  Further, as long as a defendant was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the

5

fact law enforcement chose to approach a particular defendant is without constitutional implication. Pugh was not illegally detained by any of the CIU investigators on August 2, 2007, while aboard the Amtrak train from Lincoln to Omaha.

Where a person disclaims ownership of luggage, that person has abandoned the property and lacks any standing to contest the subsequent search of the item. ***United States v. Washington***, 197 F.3d 1214 (8th Cir. 1999). In this case, the court finds Pugh denied ownership of this particular piece of luggage on three occasions. The court further finds the CIU officers did not seize the luggage until it was determined to be abandoned while in the overhead bin of the coach car. Therefore, at the time of the inquiry on the coach car lobby area or on the train platform, Pugh's disclaimer of the ownership of the piece of luggage was voluntary and not the product of unlawful activity by law enforcement. The luggage constituted abandoned property and Pugh cannot complain regarding the search of the luggage resulting in the seizure of various items therein, including the controlled substances. Pugh's motion to suppress is without merit.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Pugh's motion to suppress (Filing No. 9) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 26th day of December, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge